UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GMH CAPITAL PARTNERS LP,<br><br>      Plaintiff,<br><br>    v.<br><br>CBRE CAPITAL ADVISORS, INC. and CBRE, INC.,<br><br>      Defendants. | 25 Civ. 5462 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff GMH Capital Partners LP ("GMH" or "Plaintiff") brings this case against Defendants CBRE, Inc. and CBRE Capital Advisors, Inc. ("CBRE Cap") (collectively, "Defendants" or "CBRE"), alleging separate breach of contract claims under New York and Delaware law. Compl., ECF No. 1-1. Defendants filed a Motion to Dismiss under Rule 12(b)(6).[1] ECF No. 13. For the reasons discussed below, Defendants' Motion to Dismiss is **GRANTED**.

## BACKGROUND

### A. Factual Background[2]

GMH is a real estate company that invests in real estate assets and operating companies. *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 1, ECF No. 14. In May 2019, GMH entered into an agreement with Preferred Apartment Communities, Inc. ("PAC") to purchase

---

[1] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

[2] Unless otherwise noted, the facts in this section are taken from the Complaint, and assumed to be true for purposes of adjudicating the Motion. *See Buon v. Spindler*, 65 F.4th 64, 76 (2d Cir. 2023).

1

a portfolio of student housing assets (the "Portfolio") for $475 million.  Compl. ¶¶ 27, 29.  GMH paid a $4.75 million non-refundable deposit to maintain the exclusive right until March 4, 2020 to finalize its purchase of the Portfolio.  *Id.* ¶¶ 31-32.  On May 31, 2019, PAC publicly disclosed the purchase agreement, including the total agreed-upon purchase price of $475 million, in a Form 8-K.  Defs.' Mem. at 7; PAC Form 8-K, ECF No. 15-1.[3]  From roughly May 2019 to March 2020, GMH conducted due diligence, including "site visits, third party reports, title and survey, market analysis, university research, capital expenditures and property budgets calculations of future revenues and property values and return on investments," resulting in a body of proprietary information GMH claims is worth over $70 million.  Compl. ¶ 33.

Defendant CBRE, Inc. is a global commercial real estate services and investment corporation, and on January 26, 2020, GMH and CBRE, Inc. entered into a non-disclosure agreement (the "NDA") to facilitate discussions regarding the potential engagement of CBRE to help GMH secure capital to finalize its acquisition of the Portfolio.  Compl. ¶¶ 39, 40; Defs.' Mem. at 1, 4.  Pursuant to the NDA, CBRE, Inc. agreed not to work with any party "introduced to [CBRE, Inc.] by GMH . . . similar to, in competition with, or which otherwise could have the effect of preventing GMH from receiving the full benefit of" the Portfolio acquisition.  Compl., Ex. A ¶ 6.  CBRE also agreed to refrain from "us[ing] [GMH's] Confidential Information for any purpose other than to evaluate the Proposed Investment and . . . [from] disclos[ing] Confidential Information to any third party."  *Id.* ¶ 2.

---

[3] *Available at* https://www.sec.gov/Archives/edgar/data/1481832/000148183219000060/a8-kxstudenthousingpsa.htm (accessed on March 27, 2026).

Soon after, the parties met in Pennsylvania to review a pitchbook prepared by Defendants, and on February 26, 2020, GMH entered into an agreement (the "Letter Agreement" or "Agreement") with CBRE Cap—a subsidiary of CBRE, Inc. "offer[ing] investment banking and advisory services with expertise in capital raising."  Compl. ¶¶ 44, 45, 48; Defs.' Mem. at 3-4. CBRE Cap and GMH are the only enumerated parties to the Agreement, *see* Compl., Ex. B, at 10, pursuant to which, CBRE Cap agreed "to act as GMH's exclusive financial advisor to find and procure equity financing for GMH's purchase of the PAC portfolio."  Compl. ¶ 48 & Ex. B, ¶ 1. The Agreement defined a "Transaction" as "a potential financing for the issuance of privately-placed equity or equity linked securities to certain investors in one or a series of transactions with the Company or any of its affiliates . . . related to the equity capitalization or recapitalization of [the Portfolio]." *Id.*, Ex. B, at 1.  GMH also requested that Jaclyn Fitts ("Fitts"), CBRE's Director of National Student Housing, be included on the GMH team, even though she typically worked on the brokerage side of CBRE, Inc.  *Id.* ¶¶ 6, 80; Defs.' Mem. at 5.  Fitts's involvement was not formalized in the terms of the Agreement, but CBRE Cap did "assign[] Fitts to GMH's account on an advisory role."  Compl., Ex. B; Defs.' Mem. at 5.

The Agreement also placed restrictions on CBRE Cap's activities, providing that "CBRE Cap shall not provide financial advisory services in connection with any strategic transaction through the issuance of privately-placed equity substantially similar to the Transaction contemplated herein for any company whose primary business is student housing development, management, ownership or operation, without [GMH's] prior written consent."  Compl., Ex. B, ¶ 8(f).  However, in a carve-out provision limiting the scope of this restriction, the Agreement provides:

> [GMH] acknowledges that … CBRE Cap or its affiliates may be engaged in securities trading and brokerage activities as well as investment banking and

3

> financial advisory services and may hold positions or effect transactions … , in equity, debt or other securities of [GMH] or any other party that may be involved in a Transaction … [GMH] acknowledges and agrees that … affiliates of CBRE Cap reserve the right to pursue opportunities to arrange and/or provide new financing to other parties to a Transaction[.] [GMH] acknowledges and understands that the interests of such affiliates as arranger or provider of financing to such parties may differ from those of [GMH] with respect to pricing, timing and terms and conditions of a Transaction or otherwise, and [GMH] "expressly waives any conflicts of interests which may result from the multiple roles CBRE Cap and its affiliates may have as advisor to the Company and as arranger or provider of financing to other parties to a Transaction.

*Id.* GMH failed to finalize its purchase of the portfolio by the March 4, 2020 deadline, and on April 22, 2020, CBRE Cap notified GMH that Fitts would no longer be on the GMH team due to a conflict. *Id.* ¶¶ 68, 69, 87, 90. Following notice of the change, GMH did not terminate its relationship with CBRE Cap nor did it inquire as to the nature of the conflict. *Id.* ¶ 97. GMH continued working with CBRE Cap to finalize its bid and continued to share its "strategic vision for the acquisition, its financial estimates and projections, potential equity sources, third-party reports, underwritings, site-visit reports, and . . . work product as to how the deal . . . could be closed and then managed efficiently." *Id.* ¶¶ 59, 61. PAC also agreed that, if GMH's bid were to win, it would deduct the non-refundable $4.75 million deposit from the final purchase price. *Id.* ¶ 99.

On June 10, 2020, Fitts told GMH she would be taking the Portfolio to market on PAC's behalf as its broker, and six days later, on June 16, 2020, the data room for the Portfolio publicly opened to potential bidders, with a final bid submission deadline of July 30, 2020. *Id.* ¶¶ 92, 108. TPG Realty Partners ("TPG") and Cardinal Group ("Cardinal") (collectively, the "Buying Group") submitted a bid on July 1, 2020, and in September 2020, PAC announced it had entered into a purchase agreement with the Buying Group for $478.7 million—$3.7 million more than GMH's proposed $475 million. *Id.* ¶ 111; Defs.' Mem. at 7. The sale officially closed in November 2020. Compl. ¶ 109.

4

## B. Procedural History

Plaintiff filed its original complaint against Defendants and Fitts on January 14, 2024 in this District, followed by a first amended complaint on March 28, 2024. Defs.' Mem. at 8. Defendants responded by filing a motion to dismiss, and Judge Edgardo Ramos granted the motion with regard to GMH's only federal claim under Defend Trade Secrets Act ("DTSA"), holding that the complaint failed to allege (1) that GMH possessed a trade secret, and (2) any facts that would support a misappropriation of a trade secret. *Id.* at 9. The court declined to exercise supplemental jurisdiction over the remaining state law claims but did grant leave to amend by April 18, 2025. *Id.* at 10-11. GMH did not file a second amended complaint; instead, on April 25, 2025, it filed a new complaint (the operative complaint now at issue here) in New York state court. *Id.* at 11. The statements made in the state court complaint are nearly identical to those in the complaint previously filed in this District, with the only substantive change being the omission of several claims. *Compare* Compl., *with, GMH Cap. Partners v. Fitts*, No. 24 Civ. 290 (S.D.N.Y. Mar. 28, 2025), ECF No. 1. Defendants then removed to this Court on July 1, 2025 based on diversity jurisdiction, and Plaintiff did not challenge the removal. Defs.' Mem. at 11.

## LEGAL STANDARD

Defendants bring their Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic

5

recitation[s] of the elements of a cause of action.'" *Sacerdote*, 9 F.4th at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  To state a claim, a plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and cannot rely on mere "labels and conclusions" to support a claim.  *Twombly*, 550 U.S. at 555.  "A complaint is properly dismissed where, as a matter of law, 'the allegations in a complaint, however true, could not raise a claim of entitlement to relief.'"  *Rubenstein v. Ishizuka*, No. 23 Civ. 4332, 2025 WL 1489375, at *2 (S.D.N.Y. May 23, 2025) (quoting *Twombly*, 550 U.S. at 558).

## DISCUSSION

The operative complaint in this case asserts two breach of contract claims: one for breach of the Letter Agreement, which is governed by New York law, and a second claim for breach of the NDA, which is governed by Delaware law.  The Court addresses each of these claims in turn.

### A. The Letter Agreement

Count I alleges a breach of the Letter Agreement on the grounds that, "[u]pon information and belief [Defendants] rais[ed] debt and equity capital for the TPG/Cardinal acquisition of the PAC Portfolio."  Compl. ¶ 125(e).  There is no dispute that the Agreement is governed by New York law, which provides that a plaintiff asserting a breach of a contract claim must adequately allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011).  As Plaintiff's performance under the contract is not in dispute, the Court addresses below the first, third, and fourth elements in turn.

### 1. Existence of a Contract Between GMH and CBRE, Inc.

Neither party disputes the existence of the Letter Agreement between GMH and CBRE Cap, but Defendants argue that CBRE, Inc.—the parent company of CBRE Cap—cannot be liable

6

for the alleged contract breach because it was not a signatory to the Agreement.  *See* Compl., Ex. B, at 10.

Under New York law, "it is black letter law that non-parties [to a contract] ordinarily cannot be held liable for a breach of contract." *Wiederman v. Spark Energy, Inc.*, No. 19 Civ. 4564, 2020 WL 1862319, at *5 (S.D.N.Y. Apr. 14, 2020).  "While there are limited exceptions to this rule, a plaintiff invoking these exceptions carries a 'heavy burden.'" *See id.* (quoting *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07 Civ. 432, 2008 WL 650403, at *12 (S.D.N.Y. Mar. 7, 2008)).  One such exception imposes liability upon a parent company where "the parent's conduct manifests an intent to be bound by the [subsidiary's] contract." *Horsehead Indus. Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (N.Y. App. Div. 1997) (imposing liability upon parent company where parent and subsidiary were found to be "alter egos" of one another).  Such intent may be found where the parent "negotiates a contract but has a subsidiary sign . . . [as] a dummy for the parent corporation," or if the signing subsidiary "is shown to be a mere shell dominated and controlled by the parent for the parent's own purposes." *Warnaco Inc. v. VF Corp.*, 844 F. Supp. 940, 946 (S.D.N.Y. 1994); *see also IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 403-04 (S.D.N.Y. 2009) ("A parent can be held liable for a subsidiary's breach of contract if the plaintiff can show that the parent corporation exercised complete domination of the subsidiary corporation in respect to the transaction attacked.").

GMH's theory of liability is based primarily upon the involvement of Fitts, a CBRE, Inc. employee who agreed to work on the CBRE Cap project.  But GMH's own allegations undermine the notion that CBRE, Inc. exercised the kind of complete domination over CBRE Cap that would be necessary to find that CBRE Inc. should be bound by the Letter Agreement between GMH and CBRE Cap.  For example, GMH alleges that CBRE, Inc. and CBRE Cap were plagued by "in-

7

fighting regarding commission structures," and that Fitts ultimately withdrew from the GMH team to secure a higher commission rate representing PAC as a broker through CBRE, Inc. Compl. ¶¶ 12, 116. This disagreement—which GMH alleges was significant enough to provoke "in-fighting" and Fitts's withdrawal from the CBRE Cap project to secure CBRE, Inc.'s more favorable rates— indicates that CBRE Cap exercised a degree of independence from CBRE, Inc. *Cf. Horsehead*, 657 N.Y.S.2d at 633 (imposing liability on parent company where the subsidiary was created for the sole purpose of facilitating the transaction at issue). Further, even if CBRE, Inc. intended to be bound to any extent by the Letter Agreement, such intent would be limited to the scope of Fitts' involvement with the project, which was terminated in April 2020, after which GMH continued to work with CBRE Cap for three additional months until July 2020. The continuing relationship between CBRE Cap and GMH, free from any apparent involvement of CBRE, Inc., indicates that CBRE Inc. did not exercise "complete domination" of CBRE Cap and that the two entities were not mere alter egos of each other. *See IMG Fragrance*, 679 F. Supp. 2d at 404; *Horsehead*, 657 N.Y.S.2d at 633; Compl. ¶ 90.

Separate from its theory of parent-subsidiary liability, Plaintiff argues under a theory of equitable estoppel that "through Fitts[,] [CBRE, Inc.] intentionally derived benefit from the Letter Agreement." Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Opp'n") at 17 n.10, ECF No. 20. While New York law's doctrine of equitable estoppel may impose liability upon a non-signatory, "estoppel of an unwilling non-signatory requires a showing, absent here, that the non-signatory 'knowingly exploited' the benefits of an agreement . . . and received a direct benefit of the agreement." *See AICO Int'l, E.C. v. Merrill Lynch & Co., Inc.*, 98 F. App'x 44, 46 (2d Cir. 2004). Plaintiff fails to allege any benefit that CBRE, Inc. received from the Agreement; in fact, the inclusion of Fitts on the GMH team seemed only to preclude the brokerage side of the firm from

8

engaging Fitts in other student housing deals without terminating her involvement with the GMH team due to potential conflicts of interest, as they ultimately did in this case, indicating a lack of any benefit to CBRE, Inc. in allowing Fitts to work with CBRE Cap on the transaction.  Compl. ¶ 90.  Plaintiff even attributes the decision to terminate Fitts's involvement on the GMH team to the higher commission to be earned by serving as PAC's broker, suggesting that, if anything, any involvement in the Agreement was actually detrimental to CBRE, Inc.  Compl. ¶¶ 81, 93.

In sum, the facts alleged are insufficient to meet GMH's heavy burden that CBRE, Inc. intended to be bound by the Agreement of its subsidiary CBRE Cap, or that it received a direct benefit flowing from the Agreement.  The Motion to Dismiss Count I of the Complaint as against CBRE, Inc. is therefore **GRANTED**.

### 2.  CBRE Cap's Alleged Breach of the Agreement

GMH alleges that CBRE Cap breached the Agreement by sourcing privately-placed equity for TPG and Cardinal in connection with the Portfolio acquisition.  Compl. ¶ 123(b).  GMH alleges it did not become aware of the alleged breach until 2023, *see* Compl. ¶ 74, but its claim is based primarily upon two events that occurred three years prior in 2020: (1) Fitts's disclosure of an "unspecified conflict" and removal from the team advising GMH in April 2020, followed by her notice in June 2020 of her role in taking the Portfolio to market as PAC's broker; and (2) the publication of an article about the Buying Group's acquisition of the Portfolio in November 2020. *See* Compl. ¶¶ 90, 123(e).  Solely on the basis of these two events, GMH then alleges, upon information and belief, the following series of events.  First, GMH alleges on information and belief that Fitts secured her position as "lead broker" on the Portfolio listing prior to disclosing a conflict, and then "agreed to assist TPG and Cardinal to work together to acquire the PAC Portfolio," though she avoided using CBRE's email servers to communicate with the Buying Group "because she knew that working with Cardinal violated her duties to GMH."  Compl. ¶¶

9

88-89, 105. Next, it alleges that, with Fitts's assistance, "Cardinal representatives used GMH's information to prepare their own models and projections" about the Portfolio. *Id.* ¶ 104. GMH then alleges that, ultimately, Defendants "rais[ed] debt and equity capital for the TPG/Cardinal acquisition of the PAC Portfolio," amounting to a violation of Paragraph 8(f) of the Agreement, which prohibits the rendering of financial advisory services in with connection the PAC transaction by sourcing "privately-placed equity substantially similar to the [Portfolio acquisition] . . . for any company whose primary business is student housing development, management, ownership or operation." *Id.* ¶ 123(e) & Ex. B ¶ 8(f).

Although allegations based "upon information and belief" are permissible, especially "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), they must still be "accompanied by a statement of the facts upon which the belief is founded." *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 527 (S.D.N.Y. 2013); *see also La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 297 (S.D.N.Y. 2013) ("[A] plaintiff is required . . . to show more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") Here, Fitts's disclosure of a conflict and the article covering the acquisition, without more, are insufficient to "support a reasonable inference" of the various facts regarding breach that GMH alleges upon information and belief. And "the mere possibility that [those] facts might be true" is insufficient to state a claim. *See La Russo*, 936 F. Supp. 2d at 305.

Beginning with Fitts's involvement in and withdrawal from the CBRE Cap project, this fact is of only limited relevance considering both that she is an employee of CBRE, Inc.—an entity

that is not party to the Agreement, as discussed above—and that her involvement on the CBRE Cap team advising GMH ended in April 2020—about half a year before the Buying Group's bid was accepted. Compl. ¶ 90. But even leaving those points aside, the mere disclosure of Fitts's unspecified conflict, without more, is not an adequate basis to allege that Fitts affirmatively worked with the Buying Group, let alone that she advised the Buying Group specifically on the sourcing of privately placed equity to fund the Portfolio acquisition—which is the only activity expressly prohibited by the Agreement, and thus the sole basis for GMH's allegations of a breach of it. *Id.* ¶ 80 & Ex. B ¶ 8(f). GMH emphasizes the "unspecified" nature of the conflict, apparently to cast suspicion on Fitts. *See id.* ¶¶ 93-94 (noting the "the temporal proximity between . . . notice of the conflict and Fitts's subsequent representation of PAC."). But GMH notably acknowledges that it did not inquire further about, for example, when Fitts's relationship with PAC began or whether it involved providing financial advisory services to competing bidders. *Id.* ¶ 90. In fact, GMH alleges that it "had no reason to believe at [that] time that Defendants were disloyal to GMH," *id.* ¶¶ 96, 110, a statement that undermines the notion that the mere fact that Fitts had a conflict of interest forms an adequate basis on which to support the Complaint's allegations of breach. Taken together, the facts alleged regarding the disclosure of Fitts's conflict and her withdrawal from the project—including GMH's consent to continue working with CBRE Cap following the disclosure of the conflict, and the lapse of three years in between these events and GMH's unexplained "discovery" of the purported breach—undermine rather than support GMH's "upon information and belief" allegations.

Turning to the article, it simply states that "CBRE advised TPG and Cardinal on the acquisition." *See TPG Real Estate Partners and Cardinal Group Acquire Student Housing*

*Portfolio*, Multifamily Executive (Nov. 12, 2020, at 5:43 p.m.).[4] It provides no information about which branch of CBRE—CBRE, Inc. or CBRE Cap—was involved in the transaction nor the nature—financial or real estate—of the advisory services provided. *See id.* This is an insufficient basis to allege a breach of the Agreement, which applied only to CBRE Cap, and which did not restrict Defendants from providing *any and all* services to GMH's competitors. Rather, it narrowly restricted CBRE Cap from "provid[ing] financial advisory services in connection with any strategic transaction through the issuance of privately-placed equity substantially similar to the Transaction contemplated herein for any company whose primary business is student housing development, management, ownership or operation[.]" *Id.*, Ex. B ¶ 8(f). The Agreement does not include any language explicitly prohibiting an employee of CBRE, Inc. from providing real estate brokerage services to PAC, the Buying Group, or any other parties that "may be engaged in a business which is similar to the business of [GMH]."[5] *Id.* Therefore, the fact that CBRE provided

---

[4] *Available at* https://www.multifamilyexecutive.com/business-finance/tpg-real-estate-partners-and-cardinal-group-acquire-student-housing-portfolio_o (accessed March 24, 2026).

[5] GMH raises an additional theory of breach in its Opposition to the Motion to Dismiss that was not alleged in the Complaint, contending that, under the Agreement, Defendants were permitted to engage only in "brokerage activities" in connection with a "Transaction," which the agreement defines as a transaction *involving GMH*. *See* Opp'n Mem. at 2-3; Compl., Ex. B, at 1. Plaintiff alleges that Defendants violated this provision by providing advisory services to PAC resulting in a transaction not involving GMH. This theory of liability is different from GMH's original claim that Defendants violated the Agreement by providing financial advice specifically to the Buying Group. Regardless, the portion of Paragraph 8(f) that GMH cites states that GMH acknowledges Defendants may render brokerage services to other parties to a Transaction despite the fact that "the interests of such affiliates as arranger or provider of financing to such parties may differ from those of [GMH]." Compl., Ex. B ¶ 8(f). This provision is independent from the language relevant to GMH's claim, which states that nothing in the Agreement "shall be construed to prohibit or limit the ability of CBRE Cap or its affiliates from pursuing, investigating, analyzing, or engaging in other business relationships with entities other than the Company, notwithstanding that such entities may be engaged in business which is similar to the business of the Company." *Id.* Pursuant to that provision, advisory services rendered by Defendants, other than those explicitly prohibited in the narrow restriction clause, are permitted.

*some* kind of advisory services to the Buying Group, without more, is insufficient to support an allegation that CBRE Cap provided advice specifically regarding the issuance of privately-placed equity to fund the Buying Group's Portfolio acquisition in violation of the Agreement.

In sum, because Plaintiff has failed to adequately plead facts about CBRE Cap rendering financial advisory services to the Buying Group in connection with its acquisition of the Portfolio, the breach of contract claim must be dismissed.  Accordingly, Defendants' Motion to Dismiss is **GRANTED** as to Count I against CBRE Cap.[6]

### B.  The Non-Disclosure Agreement

GMH asserts a separate breach of contract claim arising from its allegation that Defendants disclosed GMH's confidential information in violation of Paragraph 2 of the NDA, which is governed by Delaware law.[7]  Complaint ¶¶ 126-34 & Ex. A ¶¶ 2, 7(j).  To survive dismissal for breach of a contract claim under Delaware law, "the plaintiff must demonstrate: first, the existence

---

[6] The Court notes that even if Plaintiff had sufficiently pled a breach of the Agreement, this claim would still fail for failure to adequately plead damages flowing from the purported breach. Here, "[n]othing in the complaint links the alleged breach and the claimed injury, i.e., alleges specifically in what way the breach of the [Letter Agreement] caused these claimed effects." *See Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 549 (Del. Ch. 2001).  Plaintiff alleges that Defendants failed to facilitate discussions between TPG as a potential financial partner, and that, as a result, GMH "lost the opportunity to . . . close the deal." *See* Compl. ¶ 65.  But Plaintiff fails to explain why closing the deal was rendered impossible without TPG's assistance, nor does Plaintiff plead sufficient facts to support a finding that TPG would have partnered with GMH but-for CBRE's breach of the Agreement.  Rather, the Complaint itself suggests an alternate cause for GMH's failure to finalize the deal, stating that the pandemic "interrupted GMH's plans to finalize its acquisition" because "a material portion of their proposed equity for the . . . deal would likely be unavailable until the COVID-19 [p]andemic stabilized."  Compl. ¶¶ 67-68.

[7] GMH also argues that Defendants breached Paragraph 6 of the NDA, which prohibits CBRE, Inc. from "enter[ing] into any transaction with any party or parties *introduced to the Recipient by GMH . . . .*"  Compl., Ex. A ¶ 6 (emphasis added).  However, the Complaint does not allege that GMH introduced CBRE, Inc. to either PAC, TPG, or Cardinal, and so the Complaint fails to allege a breach of Paragraph 6.

of a contract . . . ; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). As neither party disputes the existence of the NDA, the Court will address only the second and third elements—breach of the contract and damages—which, as explained below, GMH has failed to adequately allege.

GMH's theory of breach, which is premised entirely upon allegations based upon information and belief, posits the following: CBRE's commission structure "financially incentivized employees to broker deals rather than represent potential buyers in a transaction," meaning that Fitts would receive lower compensation from assisting GMH in its purchase of the Portfolio than by assisting PAC as its broker in the sale of the Portfolio. Compl. ¶¶ 78, 81–82. However, "Fitts went one step further," and "after [she] secured the brokerage listing of the PAC Portfolio," "[she] realized she could pocket even more from the transaction if she were to assist one of GMH's competitors in securing the PAC Portfolio," leading her to work with the Buying Group to acquire the Portfolio "on terms more favorable to her than what she could have obtained from GMH's successful acquisition of the Portfolio." *Id.* ¶¶ 85, 101–02. This led Fitts to "willfully and maliciously share[] GMH's Confidential Information with the Buying Group[;]" improper behavior she hid by "not us[ing] CBRE's email servers to communicate with Cardinal or TPG[.]" *Id.* ¶¶ 105, 112.

Not only does GMH fail to allege which of the due diligence materials covered by the NDA's definition of "Confidential Information" Defendants purportedly shared with the Buying Group, it also fails to "include any factual allegations to support [the] conclusory allegation that Defendants used this material." *See Atl. Basin Refin., Inc. v. ArcLight Cap. Partners, LLC*, Civ. No. 2015-0071, 2018 WL 3431974, at *23 (D.V.I. July 16, 2018) (contrasting with *NACCO Indus.,*

14

*Inc. v. Applica Inc.*, 997 A.2d 1, (Del. Ch. 2009), in which "plaintiff was able to pinpoint the dates and the precise manner as to how the defendant violated the contract's exclusivity and confidentiality provisions, as well as identity the persons involved"); Compl., Ex. A ¶ 1(b); *see also Atl. Basic Refin., Inc.*, 2018 WL 3431974 at *22-25 (dismissing for failure to support a breach of contract claim apart from the purported sharing of information within a broad time range essentially covering the parties' relationship).

Plaintiffs contend that Defendants' use of confidential information can be inferred from Plaintiff's allegation that the Buying Group's submission of its bid two weeks after the data room opened was "an impossible feat given the complexity of the bid and the travel limitations imposed by COVID-19," and that "the only way [they were able to do so] in such a compressed time frame — especially during the early stages of the COVID-19 Pandemic" was through CBRE's sharing of GMH's confidential information with the Buying Group. Compl. ¶¶ 111, 113. But Judge Ramos rejected essentially the same allegations in dismissing GMH's DTSA claim, as follows:

> GMH merely asserts that the complexity of the bid and the travel limitations imposed by COVID-19 would have made the timing of the bid "impossible," but does not explain why. Indeed, the complaint makes no specific allegations as to why this bid was particularly complex, why two weeks with access to the data room would not be enough time for the Buying Group to prepare a bid on its own, or why travel limitations would have any impact on its ability to do so. Notably, GMH also fails to adequately address the fact that the Buying Group had access to publicly available information filed with the SEC, including PAC's financial details and GMH's original bid.

*GMH Cap. Partners v. Fitts*, No. 24 Civ. 290, 2025 WL 950674, at *10 (S.D.N.Y. Mar. 28, 2025). As before, Plaintiff conclusorily asserts that the complexity of the bid and the impact of the pandemic made it impossible for another bidder to submit a winning bid without the help of GMH's confidential information—but they do not explain why this would have been the case. Indeed, GMH's own bid was based on a valuation of $475 million, which GMH arrived at prior to approaching PAC and receiving access to any private information, and as Defendants note, "[t]here

was a plethora of information publicly available regarding PAC's operations and GMH's contract with PAC," the proposed purchase price of which was listed in public SEC filings. Defs.' Mem. at 21-22. In sum, just as Judge Ramos held in dismissing GMH's DTSA claim, this Court concludes that Plaintiff "does not sufficiently allege that any confidential information was ever disclosed by Fitts to the Buying Group." *See id.* at *10.

Because "conclusory beliefs about the use of [Plaintiff's] confidential information [are] not enough to support a reasonable inference that [CBRE, Inc.] breached the NDA," *see Cardiovascular Support Perfusion Reliance Network, LLC v. SpecialtyCare, Inc.*, 629 F. App'x 673, 677 (6th Cir. 2015), Plaintiff has "failed to allege [breach of the NDA]," and the breach of non-disclosure agreement claim must be dismissed.[8] *See GMH Cap. Partners v. Fitts*, 2025 WL 950674 at *10. Defendants' Motion to Dismiss is **GRANTED** as to GMH's claim for breach of non-disclosure agreement.

## CONCLUSION

For the reasons discussed herein, Defendant CBRE, Inc. is not liable for the breach of contract claim (Count I), and CBRE, Inc. is **DISMISSED** as to that claim. Remaining Defendant CBRE Cap's Motion to Dismiss is also **GRANTED** with respect to GMH's breach of contract claim. Further, Defendants' Motion to Dismiss is **GRANTED** as to GMH's breach of non-disclosure agreement claim (Count II).

---

[8] The Court notes that, as with GMH's other breach of contract claim, even if GMH had pleaded sufficient facts to support a finding of breach of the NDA, "[n]othing in the complaint links the alleged breach and the claimed injury, i.e., alleges specifically in what way the breach of the [NDA] caused these claimed effects." *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 549 (Del. Ch. 2001). In light of facts raised by the Plaintiff itself—namely the pandemic and the amount of publicly available information regarding the Portfolio as well as the agreement between GMH and PAC—there is nothing in the Complaint directly linking breach of the NDA and GMH's failure to secure the Portfolio acquisition.

The Clerk of Court is respectfully requested to terminate ECF 13 and to close this case.


SO ORDERED.

Dated: March 27, 2026

New York, New York


_____
DALE E. HO

United States District Judge